United States Courts
Southern District of Texas
FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

DEC 2 1 2016

David J. Bradley, Clerk of Court

UNITED STATES OF AMERICA,
*ex rel.* JANI GWEN WHITNEY,

               Relator,

v.

ALTUS HOSPICE MANAGEMENT, L.P.;
ALTUS HOSPICE OF HOUSTON, L.P.;
ALTUS HOSPICE OF BEAUMONT, L.P.;
ALTUS HOSPICE OF LONGVIEW, L.P.;
ALTUS HOSPICE OF CORPUS CHRISTI, L.P.;
ALTUS HOSPICE OF DALLAS, L.P.;
ALTUS HOSPICE OF AUSTIN, L.P.;
ALTUS HOSPICE OF FORT WORTH, L.P.;
ALTUS HOSPICE OF LAS VEGAS, L.P.;  and
ALTUS HOSPICE OF SAN ANTONIO, L.P.,
ALTUS NOBLE HOSPICE GP, LLC,
ZT MANAGEMENT, L.L.C.,
ALTUS HARBOR HOSPICE MANAGEMENT,
L.L.C., TASEER A. BADAR AND ZOHRA R.
BADAR

               Defendants.

Case No.: H 16 3704

**ORIGINAL COMPLAINT FOR:**
**Violations of False Claims Act, 31**
**U.S.C. § 3729 *et seq.***

**FILED UNDER SEAL**
**PURSUANT TO 31 U.S.C.**
**§3730(b)(2)**

**JURY TRIAL DEMANDED**

## ORIGINAL COMPLAINT

1.    Relator, Jani Gwen Whitney, through her attorneys and on behalf of the

United States of America, hereby files this Original Complaint against Defendants, Altus

Hospice Management, L.P.; Altus Hospice of Houston, L.P.; Altus Hospice of

Beaumont, L.P.; Altus Hospice of Longview, L.P.; Altus Hospice of Corpus Christi, L.P.;

Altus Hospice of Dallas, L.P.; Altus Hospice of Austin, L.P.; Altus Hospice of Fort Worth,

L.P.; Altus Hospice of Las Vegas, L.P.; Altus Hospice of San Antonio, L.P., Altus Noble

1

Hospice GP, LLC, ZT Management, L.L.C., Altus Harbor Hospice Management, L.L.C., Taseer A. Badar and Zohra R. Badar (collectively referred to herein as "Altus" or "Defendant"), and alleges as follows:

## I.     INTRODUCTION

2.     Relator, Jani Whitney brings this *qui tam* action pursuant to the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, arising from Defendant's fraudulent schemes in connection with false claims submitted to the Government for hospice services.

3.     Relator brings this action on behalf of the United States and the Department of Health and Human Services ("HHS") and the Center for Medicare and Medicaid Services ("CMS"), which administer the federal Medicare and Medicaid Programs.

4.     Medicare is a federally funded health care program that provides basic medical insurance to qualified residents of the United States who are age 65 or older, younger people with disabilities, and people with End Stage Renal Disease (permanent kidney failure requiring dialysis or transplant). Medicare is not a free health care program, as United States citizens through their taxes pay a majority of the Medicare Program's costs. In addition to paying for doctor visits, nursing home care, and hospital stays, Medicare pays for what is known as hospice care for eligible Medicare recipients.

5.     Altus is a for-profit network of hospice providers. Altus significantly funds its operations and its employees through receipt of Medicare dollars on behalf of individuals who are supposed to be eligible to receive Medicare hospice benefits.

6.     To be eligible for hospice care paid by Medicare, an individual must be

"terminally ill," meaning that that "the individual has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course." 42 C.F.R. § 418.3.

7.     While elderly patients may qualify for a variety of other medical services paid by Medicare, for-profit hospice companies like Altus are entitled to receive Medicare dollars only for Medicare recipients who are "terminally ill." When a business such as Altus admits a Medicare recipient to hospice care, that individual no longer receives, or is entitled to receive, services intended to cure his or her illness. Instead the individual can receive only palliative care, meaning care intended to relieve pain, symptoms, or stress of terminal illness, including a comprehensive set of medical, social, psychological, emotional, and spiritual services. Congress authorized funding from limited Medicare funds for this specialized hospice benefit during the last several months of an individual's life.

8.     Altus, through its reckless and intentional business practices, admitted and retained individuals across the United States who were not eligible to receive Medicare hospice benefits, because it was financially lucrative, and did so even after Relator alerted Altus to this pattern of Medicare fraud. Altus misspent millions of Medicare dollars intended for Medicare recipients who have a prognosis of six months or less to live and need hospice care.

9.     Altus is liable under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, due to its conduct in submitting false and fraudulent records, statements, and claims for payment by the United States to the Medicare Program.

3

## II.    THE PARTIES

10.    Relator, Jani Gwen Whitney, is a citizen of Texas, residing in Kingwood, Harris County, Texas.

11.    Altus Hospice Management, L.P. is a limited partnership, located in Harris County, Texas at 19707 Sweet Forest Lane, Humble Texas, 77346. Its registered agent for service is Taseer A. Badar, 11233 Shadow Creek Parkway, Suite 313, Pearland, TX 77584. Its General Manager is ZT Management, L.L.C., 4265 San Felipe, Ste 1100, Houston, TX 77027.

12.    Altus Hospice of Houston, L.P. is a limited partnership, located in Harris County, Texas at 11233 Shadow Creek Parkway, Suite 313, Pearland, TX 77584. Its registered agent for service is Taseer A. Badar, 11233 Shadow Creek Parkway, Suite 313, Pearland, TX 77584. Its General Manager is Altus Harbor Hospice Management, LLC, 4265 San Felipe, Suite 1100, Houston, TX 77027. In October 2011, it changed its name to Altus Hospice of Houston, LP from Altus Harbor Hospice, L.P.

13.    Altus Hospice of Beaumont, L.P.; is a limited partnership, located in Harris County, Texas at 19707 Sweet Forest Lane, Humble Texas, 77346. Its registered agent for service is Taseer A. Badar, 11233 Shadow Creek Parkway, Suite 313, Pearland, TX 77584. Its General Manager is Altus Noble Hospice GP, LLC., 19707 Sweet Forest Lane, Humble Texas, 77346.

14.    Altus Hospice of Longview, L.P. is a limited partnership, located in Harris County, Texas at 11233 Shadow Creek Parkway, Suite 313, Pearland, TX 77584. Its registered agent for service is Taseer A. Badar, 11233 Shadow Creek Parkway, Suite 313, Pearland, TX 77584. Its General Manager is Altus Noble Hospice GP, LLC., 11233

4

Shadow Creek Parkway, Suite 313, Pearland, TX 77584.

15.     Altus Hospice of Corpus Christi, L.P. is a limited partnership, located in Harris County, Texas at 11233 Shadow Creek Parkway, Suite 313, Pearland, TX 77584. Its registered agent for service is Taseer A. Badar, 11233 Shadow Creek Parkway, Suite 313, Pearland, TX 77584. Its General Manager is Altus Noble Hospice GP, LLC., 11233 Shadow Creek Parkway, Suite 313, Pearland, TX 77584.

16.     Altus Hospice of Dallas, L.P. is a limited partnership, located in Harris County, Texas at 11233 Shadow Creek Parkway, Suite 313, Pearland, TX 77584. Its registered agent for service is Taseer A. Badar, 11233 Shadow Creek Parkway, Suite 313, Pearland, TX 77584. Its General Manager is Altus Noble Hospice GP, LLC., 11233 Shadow Creek Parkway, Suite 313, Pearland, TX 77584

17.     Altus Hospice of Austin, L.P. is a limited partnership, located in Harris County, Texas at 11233 Shadow Creek Parkway, Suite 313, Pearland, TX 77584. Its registered agent for service is Taseer A. Badar, 11233 Shadow Creek Parkway, Suite 313, Pearland, TX 77584. Its General Manager is Altus Noble Hospice GP, LLC., 11233 Shadow Creek Parkway, Suite 313, Pearland, TX 77584.

18.     Altus Hospice of Fort Worth, L.P. is a limited partnership, located in Harris County, Texas at 11233 Shadow Creek Parkway, Suite 313, Pearland, TX 77584. Its registered agent for service is Taseer A. Badar, 11233 Shadow Creek Parkway, Suite 313, Pearland, TX 77584. Its General Manager is Altus Noble Hospice GP, LLC., 11233 Shadow Creek Parkway, Suite 313, Pearland, TX 77584.

19.     Altus Hospice of Las Vegas, L.P. is a limited partnership, located in Harris County, Texas at 11233 Shadow Creek Parkway, Suite 313, Pearland, TX 77584. Its

registered agent for service is Taseer A. Badar, 11233 Shadow Creek Parkway, Suite 313, Pearland, TX 77584. Its General Manager is Altus Noble Hospice GP, LLC., 11233 Shadow Creek Parkway, Suite 313, Pearland, TX 77584.

20.     Altus Hospice of San Antonio, L.P. is a limited partnership, located in Harris County, Texas at 11233 Shadow Creek Parkway, Suite 313, Pearland, TX 77584. Its registered agent for service is Taseer A. Badar, 11233 Shadow Creek Parkway, Suite 313, Pearland, TX 77584. Its General Manager is Altus Noble Hospice GP, LLC., 11233 Shadow Creek Parkway, Suite 313, Pearland, TX 77584.

21.     Altus Noble Hospice GP, LLC. is a limited liability company, located at 11233 Shadow Creek Parkway, Suite 313, Pearland, TX 77584. Its registered agent for service is Taseer A. Badar, 4265 San Felipe, Ste 1100, Houston, TX 77027. Its two directors are Taseer A. Badar and Zohra R. Badar, both located at 11233 Shadow Creek Parkway, Suite 313, Pearland, TX 77584.

22.     ZT Management, L.L.C. is a limited liability company, located at 11233 Shadow Creek Parkway, Suite 313, Pearland, TX 77584. Its registered agent for service is Taseer A. Badar, 4265 San Felipe, Ste 1100, Houston, TX 77027. Its two directors are Taseer A. Badar and Zohra R. Badar, both located at 11233 Shadow Creek Parkway, Suite 313, Pearland, TX 77584.

23.     Altus Harbor Hospice Management, L.L.C. is a limited liability company, located at 11233 Shadow Creek Parkway, Suite 313, Pearland, TX 77584. Its registered agent for service is Taseer A. Badar, 4265 San Felipe, Ste 1100, Houston, TX 77027. Its two directors are Taseer A. Badar and Zohra R Badar, both located at 11233 Shadow Creek Parkway, Suite 313, Pearland, TX 77584.

6

24.     Taseer A. Badar is an individual, citizen of Texas, residing at 19707 Sweet Forest Lane, Humble Texas, 77346.

25.     Zohra R. Badar, is an individual, citizen of Texas, residing at 19707 Sweet Forest Lane, Humble Texas, 77346.

### III.     JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1345, and supplemental jurisdiction to entertain common law or equitable claims pursuant to 28 U.S.C. § 1367(a).

27.     This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a). Jurisdiction is proper over the Defendant because the Defendant can be found in, resides in, and/or has transacted business within this Court's jurisdiction, and some of the acts in violation of 31 U.S.C. § 3729 occurred within this district.

28.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)-(c), and 31 U.S.C. § 3732(a) because the Defendant resides in or transacts business in this district and because a substantial portion of the events or omissions giving rise to the claims alleged herein occurred in this district.

29.     Relator has direct and independent knowledge of the alleged fraud and disclosed this information to the government before filing suit, pursuant to 31 U.S.C. § 3730(e)(4)(B).

30.     Relator reported these activities to CMS and Palmetto in or around February 2016, and disclosed them to the US Attorney's office in Houston, Texas in December of 2016.

31.     In or around October 2016, Relator was contacted by Barbara R. Alleman,

an investigator from Health Integrity, LLC, and notified that an investigation has recently been opened on this matter.

32.     Relator believes that there has been no public disclosure of these allegations and transactions such that subparagraph (e)(4) does not apply and this disclosure was not necessary. However, as a precautionary measure, in the event there has been a public disclosure, Relator made this pre-complaint disclosure in order to qualify as an "original source" under subparagraph (e)(4)(B)(2).  Relator has knowledge that is independent of, and materially adds to, any publicly disclosed allegations or transactions, and voluntarily provided the information to the Government before filing his False Claims Act complaint.

33.     Relator is familiar with Defendant's fraudulent billing practices alleged in this Complaint and is aware that the pervasive misconduct at issue occurred in this District.

## IV.     THE FALSE CLAIMS ACT

34.     The False Claims Act provides, *inter alia*, that any person who--

(A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C)     conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); . . .  or

(G)     knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the

Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-4101), plus 3 times the amount of damages which the Government sustains because of the act of that person. (The adjusted civil penalty range is $10,781 - $21,563, for conduct after November 2, 2015.)

31 U.S.C.A. § 3729 (a)(1)(A-G).

35.     The term "claim" includes "any request or demand, whether under a contract or otherwise, for money . . . that—

(i)     is presented to an officer, employee, or agent of the United States; or

(ii)     is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I)     provides or has provided any portion of the money or property requested or demanded; or

(II)     will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . .

31 U.S.C.A. § 3729 (a)(2).

36.     Any person who knowingly submits a false or fraudulent claim to the Government for payment or approval (or to a contractor if the money is to be spent on the Government's behalf or to advance a Government program and the Government provides any portion of the money requested or demanded) is liable to the Government for a civil penalty between $5,500 and $11,000 for each claim (the range increases to $10,781 - $21,563, for conduct after November 2, 2015), plus three times the actual damages that the Government sustained.  31 U.S.C. § 3729(a).  The Act also permits assessment of the civil penalty even without proof of specific damages.

37.     The FCA defines a "claim" for payment to include "any request or

9

demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c).

38.     For purposes of the False Claims Act, "knowing" and "knowingly" (A) mean that a person, with respect to information-- (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud.

## V.    THE MEDICARE PROGRAM

39.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 et seq., establishes the Health Insurance for the Aged and Disabled Program, commonly referred to as the Medicare Program (the "Medicare Program" or "Medicare").

40.     The Medicare Program is comprised of four parts. Medicare Parts B, C and D are not directly at issue in this case.

41.     Part A of the Medicare Program is a 100 percent federally funded health insurance program for qualified residents of the United States aged 65 and older, younger people with qualifying disabilities, and people with End Stage Renal Disease (permanent kidney failure requiring dialysis or transplant). The majority of Medicare Part A's costs are paid by United States citizens through their payroll taxes. The benefits covered by Part A of the Medicare Program include hospice care under 42 U.S.C. §1395x(dd).

42.     The United States provides reimbursement for Medicare claims from the Medicare Trust Funds through CMS. CMS, in turn, contracts with Medicare Administrative Contractors, formerly known as "fiscal intermediaries" (hereinafter "MACs") to review, approve, and pay Medicare bills, called "claims," received from health care providers, such as Defendant's providers. In this capacity, the MACs act on behalf of CMS.

43.     Payments are typically made directly to health care providers, such as Defendant's providers, rather than to the patient. This occurs when the Medicare recipient assigns his or her right to payment to the provider, such as Defendant's providers. In that case, the provider submits its bill directly to Medicare for payment.

44.     In order to bill the Medicare Program, a provider must submit an electronic or hard copy claim form called a CMS-1500 form. When the CMS-1500 form is submitted, the provider certifies that the services in question were "medically indicated and necessary for the health of the patient."

45.     On the CMS-1500 form, the provider must state, among other things, the procedure(s) for which it is billing Medicare, the identity of the patient, the provider number, and a brief narrative explaining the diagnosis and the medical necessity of the services rendered.

46.     All healthcare providers, including Defendant's providers, must comply with applicable statutes, regulations and guidelines in order to be reimbursed by Medicare Part A.

47.     A provider has a duty to have knowledge of the statutes, regulations and guidelines regarding coverage for the Medicare services, including, but not limited to,

the following: (a) Medicare reimburses only reasonable and necessary medical services furnished to beneficiaries. See 42 U.S.C. § 1395y(a)(1)(A), and (b) Providers must assure that they provide economical medical services, and then, only when, and to the extent, medically necessary. See 42 U.S.C. § 1320c-5(a)(1).

48.    Medicare regulations exclude from payment services that are not reasonable and necessary. See 42 C.F.R. § 411.15(k).

49.    Because it would not be feasible to review medical documentation before paying each claim, the MACs generally make payment under Medicare Part A on the basis of the providers' certification on the Medicare claim form that the services in question were "medically indicated and necessary for the health of the patient." The claims are paid from the Medicare Trust Funds, funded by American taxpayers.

## VI.    APPLICABLE REGULATIONS

50.    Hospice is a program to provide palliative care to patients instead of curative care. Palliative care is aimed at relieving pain, symptoms, or stress of terminal illness. It includes a comprehensive set of medical, social, psychological, emotional, and spiritual services provided to a terminally ill individual. Medicare recipients who elect hospice care agree to forego curative treatment of their terminal illnesses. In other words, patients who receive the Medicare hospice benefit no longer receive care that leads to a cure of their illnesses.

51.    Pursuant to 42 C.F.R. § 418.20, in order to be eligible to elect hospice care under Medicare, an individual must be—(a) Entitled to Part A of Medicare; and (b) Certified as terminally ill in accordance with § 418.22.

52.    According to 42 C.F.R. § 418.3, "terminally ill" means that a person "has a

medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course."

53.     Hospice is available to individuals for two initial 90-day periods, and then an unlimited number of 60-day periods, provided the individual's terminal condition is certified in writing by a physician at the beginning of each period.

54.     The initial 90-day period must be certified by (a) the Medical Director of the hospice or physician-member of the hospice inter-disciplinary group and (b) the individual's attending physician, if the individual has an attending physician. For subsequent periods, certification requires only one of the aforementioned physicians. 42 C.F.R. § 418.22.

55.     The written certification requires: (1) a statement that the individual's medical prognosis is that his or her life expectancy is six months or less if the terminal illness runs its normal course; (2) specific clinical findings and other documentation supporting a life expectancy of six months or less; and (3) the signature(s) of the physician(s). Id.; Medicare Benefit Policy Manual ("Policy Manual"), Chapter 9, § 20.1.

56.     Hospices are paid a per diem rate based on the number of days and level of care provided during the election period. Policy Manual, Chapter 9, § 40; 42 C.F.R. § 418.302. To be covered, hospice services must be:

> reasonable and necessary for the palliation and management of the terminal illness as well as related conditions. The individual must elect hospice care in accordance with § 418.24. A plan of care must be established and periodically reviewed by the attending physician, the medical director, and the interdisciplinary group of the hospice program as set forth in § 418.56. That plan of care must be established before hospice care is provided. The services provided must be consistent with the plan of care. A certification that the individual is terminally ill must be completed as set forth in § 418.22.

42 C.F.R. § 418.200.

57.     It is a condition of participation that hospices must maintain a clinical record for each hospice patient that contains "correct clinical information." All entries in the clinical record must be "legible, clear, complete, and appropriately authenticated and dated..." 42 C.F.R. § 418.104.

58.     Medicare's regulations governing hospices require the hospice medical record to include "clinical information and other documentation that support the medical prognosis" and "the physician must include a brief narrative explanation of the clinical findings that supports a life expectancy of 6 months or less as part of the certification and recertification forms." 42 C.F.R. § 418.22(b)(2) and (3).

59.     Local coverage determinations ("LCD") specify under what clinical circumstances a service is considered to be reasonable and necessary and thus covered by Medicare. Medicare administrative contractors ("MAC") issue LCDs to provide guidance to the public and medical community within their jurisdictions. MACs develop LCDs by "considering medical literature, the advice of local medical societies and medical consultants, public comments, and comments from the provider community." Medicare Program Integrity Manual, Chapter 13, § 13.1.3.

60.     Palmetto GBA, LLC ("Palmetto") is the MAC responsible for processing Home Health and Hospice claims submitted by Defendant for payment by Medicare. Palmetto has issued LCD's that set forth medical criteria for determining whether individuals with certain diagnoses have a prognosis of six months or less to live.

61.     Palmetto's hospice-related LCD's include: Hospice - HIV Disease (L34566), Hospice - Liver Disease (L34544), Hospice - Neurological Conditions

14

(L34547), Hospice - Renal Care (L34559), Hospice Alzheimer's Disease & Related Disorders (L34567), Hospice Cardiopulmonary Conditions (L34548), and Hospice The Adult Failure To Thrive Syndrome (L34558).

## VII.   THE RELATOR

62.    Relator, Jani Gwen Wallace-Whitney received a Bachelors of Science-Nursing degree from Western Governors University in Salt Lake City, Utah. She received an Associates Degree-Nursing degree from Lee College in Baytown, Texas.

63.    She is a Certified Hospice and Palliative Nurse, and is an Approved Hospice and Palliative Educator by the HPNA (Hospice and Palliative Nurses Association.)

64.    Relator is the Vice-President of the Greater Houston Area chapter of the HPNA.

65.    She has continually worked in nursing from 2004 to the present, and has worked in the hospice field from 2008 to 2016.

66.    She was hired by Altus on October 12, 2015, as the RN Case Manager. Her job duties were to evaluate patient appropriateness for hospice care; obtain signed consent forms; order medication, equipment and comfort kits for patients; arrange ambulance transport; coordinate patient admission and complete the Comprehensive Assessment and the Comprehensive Admission upon patient's arrival home; report on patient evaluation to the Medical Doctors and Nurse Practitioners; documentation of consent, GIP (General Inpatient care) admissions, initiate Crisis Care in the patient's home if appropriate; and participate in IDT (inter-disciplinary team) meetings.

67.    Shortly after being hired, she began to witness the wrongdoing described

below in this Complaint. She made good faith efforts to educate her co-workers and supervisors about the applicable regulations and encourage Altus to comply, but her efforts were constantly rebuffed.

68.     She resigned on January 1, 2016.

## VIII.   THE DEFENDANTS

69.     Altus is a network of hospice companies owned and controlled by Taseer A. Badar. The network includes several limited partnerships named after the cities where they do business in line with the following general formula: "Altus Hospice of [name of city], L.P." The cities include Houston, Beaumont, Longview, Corpus Christi, Dallas, Austin, Fort Worth, San Antonio and Las Vegas. The general partner of each of these limited partnerships is a one of three limited liability companies owned and controlled by Taseer A. Badar (Altus Noble Hospice GP, LLC; ZT Management, L.L.C.; or Altus Harbor Hospice Management, L.L.C). The company also has interests in Karachi.

70.     All corporate and partnership defendants operate under common management and control.

71.     According to its website, Altus has locations in Austin (Round Rock), Beaumont, Corpus Christi, Dallas (Addison), Houston (Sugar Land), Las Vegas, North Houston (Spring), and South Texas (Laredo).

72.     Although this network includes individual limited partnerships, it operates as a single entity under control of Taseer A. Badar. All employees of Altus answer to Taseer A. Badar, and receive their common training from him.

73.     Although Relator was employed at a Houston Altus location, the practices

16

she alleges herein are company-wide practices that emanated from the top.

### IX.   THE SUBMISSION OF FALSE CLAIMS

74.   During 2015, and presumably for several years before that, Defendant knowingly submitted or caused the submission of false claims to Medicare and created false records and statements to receive reimbursement from Medicare for hospice care. Although Altus only employed Relator from October of 2015 to January of 2016, it was clear that the patterns of fraud she witnessed had been in place for years.

75.   During this time, Altus falsely certified on electronic claim forms submitted to Medicare that hospice care provided to Medicare recipients across the United States was "medically indicated and necessary for the health of the patient."

76.   Altus created and/or submitted documentation that falsely represented that certain Medicare recipients were "terminally ill," meaning that the "individual has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course."

77.   Many of the Medicare recipients were not eligible for hospice care paid for by the Medicare Program because they did not have a prognosis of six months or less to live if the illness runs its normal course.

78.   A sophisticated hospice provider such as Altus is expected to fully know and appreciate the Medicare statute, the definition of "terminally ill," and the local coverage determinations that set out medical criteria for determining whether individuals with certain diagnoses have a prognosis of six months or less to live. The purpose of the Medicare requirements is to ensure that the limited Medicare funds are properly spent on services actually needed by Medicare beneficiaries. Altus has a duty to deal

honestly with the Government.

79.     Altus knew, deliberately ignored, or recklessly disregarded that the claims it submitted to Medicare falsely represented the medical condition and hospice eligibility of the beneficiaries. In addition, Altus knew or recklessly disregarded that its business practices would lead to the submission of false claims to Medicare for hospice services provided to ineligible beneficiaries.

80.     Dr. Ahmed Qadri ("Qadri") was Defendant's Medical Director.

81.     Qadri was also a physician with a private practice. His office is located inside of Kingwood Medical Center. This gives him greater access to potential Hospice patients.

82.     Qadri re-certified patients for hospice (including Patient 1) even though Registered Nurses and Nurse Practitioners treating the patient documented that the patient was not eligible for hospice.

83.     **Patient 1** was re-certified as eligible for hospice by Qadri despite being ineligible. Altus was notified by multiple providers, including the nurses treating her, that Patient 1 was not eligible for hospice care. Relator also noted that Patient 1 was not eligible for re-certification in an Inter-Disciplinary Team email to Altus management at time for patients recertification.   Nevertheless, Patient 1 remained on service. This occurred on or around January 4, 2016.

84.     Qadri referred his private practice patients to Defendants for hospice treatment (including **Patient 2**), even though they were not eligible for hospice treatment and he was still providing them curative treatments in his private practice.

85.     Patient 2 was active on a daily basis. She had routine follow-up

18

appointments with Dr. Qadri in his office. She was placed on Hospice because she was informed that hospice would pay for her medications. The diagnosis of Patient 2 was falsified as CHF and COPD. Patient 2 denied having either of these diagnoses and was able to produce medical records verifying these facts in December 2015.

86.    **Patient 3** was told by Defendants that she had colon cancer when she did not have colon cancer. Defendants lied to her just to get her into hospice service. She was told upon admission that she had colon cancer and would never eat or drink again due to bowel obstruction. However, she was eating and drinking without complication during Relator's assessment of her. She was also having active bowel movements into a colostomy bag, and displayed no active nausea, vomiting or any other signs of bowel obstruction. She also had a very difficult time getting proper equipment for colostomy supplies. Her requests for this equipment were repeatedly denied by Altus management with cost being cited as reason for denial. She actively sought treatment at MD Anderson from an oncologist even after explanation of Hospice criteria. Management wanted to change her primary care provider to keep her from MD Anderson. This occurred in December 2015.

87.    **Patient 4** was put on hospice by Defendants after signing hospice consent forms without understanding what they were. Patient 4 was informed during signing of consents that he would have to stop dialysis if he wish to be placed on hospice, but he did not speak English and did not understand what he was being told. An official translator was never contacted to explain the meaning of hospice in detail. Defendant's marketing personnel used a hospital nurse as an unofficial translator when she placed him on hospice. Patient 4 was placed on hospice without appropriate knowledge,

understanding, and informed consent, and without an assessment by a licensed healthcare professional.

88.     Although Patient 4 was alert and oriented, his spouse was allowed to sign consent forms for hospice care. Upon assessment by Relator, Relator explained to Patient 4 all aspects of hospice care through the use of telephone translation service. At that point, Patient 4 stated that he did not want hospice care because he wanted curative treatment; he wanted to fight, and not give up. Patient 4 had his dialysis catheter removed in the hospice with the thoughts that it would be replaced and that Altus was going to assist him in continuation of his needed dialysis. Upon coercing patient onto hospice through deception, Altus marketer essentially signed his death certificate.  Because Patient 4 was an unfunded and an undocumented citizen, Altus had nothing to gain from placing patient on service, but the marketer would still receive a bonus for signing him up. This occurred in January 2016.

89.     **Patient 5** was put on hospice by Defendants despite not being eligible for hospice.

90.     **Patient 6** was put on hospice by Defendants and kept on hospice for years despite not being eligible.

91.     Patient names will be submitted to the Court separately under seal in order to maintain patient confidentiality.

92.     Qadri gave Melissa Meredith, one of Defendant's marketers (a nonclinical salesperson) a key to his office, and allowed her to go into his office after hours and go through his private practice patient charts to see who she thinks "may be appropriate" for referring to hospice. Meredith was promoted to Executive Director, and received

20

bonuses for every admission and a new car.

93.     Qadri did not perform true Interdisciplinary Team (IDT) meetings before referring a patient to hospice.

94.     Qadri did not sign Certificates of Terminal Illness (CTI's) before admitting a patient to hospice.

95.     Relator reported the wrongful activity alleged in this complaint to multiple supervisors within Altus, including Jacqueline Richard (Assistant Director of Nursing), Sharon Hebert (Executive Director), and Brian Wallace (Head of HR).

96.     Kazia Brown did billing for Defendants and was asked by Defendants to back-date consent forms for deceased patients.

97.     Altus marketers consistently obtained consents from patients prior to assessment by admission nurses. They obtained patient consent by making false promises, providing misleading information, and deceiving patients.

98.     Altus staff lacked knowledge of CMS regulations regarding continuing to provide patients with the medications or supplies they were using before being admitted to hospice.

99.     Altus routinely allowed admission nurses and Melissa Meredith (a marketer with no clinical experience) to make the initial determination of a patient's eligibility for hospice. Melissa Meredith was also allowed to send out a patient report/assessment via email on each potential admission, which is not appropriate, and order patient comfort kits that were delivered to the patient's place of residence. These comfort kits included Schedule II and III medications, which are controlled substances requiring a Medical Doctor's order in triplicate form. Melissa Meredith also improperly

assessed patient's needs for durable medical equipment, which also requires a Medical Doctor's order, either written or verbal. Marketers, like Ms. Meredith, are not allowed to take these orders from the Medical Doctor; only a Registered Nurse can take verbal doctor orders within Altus Hospice, as per the Texas Board of Nursing.

100.    Altus's marketers, like Melissa Meredith (whose official title is Physician and Public Relations Manager, and Executive Director), routinely approached hospital patients and/or their family members, while the patient was still in the hospital, to persuade patients to sign consent forms and have them admitted to hospice prior to RN or MD assessment of the patient for hospice eligibility.

101.    Altus forces its marketers to have patients sign consent and "EOB" (Election of Benefit) forms improperly, and those patients were routinely admitted to hospice service without a witness signature on admission documents until the admitting nurse arrived at the patient's home to perform an evaluation.

102.    Admission documents, such as consent forms, EOB forms, "NOS" (Notification of Start Date forms, stating when hospice admission begins), and "CTI" (Certificate of Terminal Illness forms) were regularly prepared fraudulently, with no enforcement mechanism to prevent the fraud.

103.    Melissa Meredith routinely obtained signed consent forms prior to the required patient evaluation by a licensed healthcare professional trained in assessment. Every such form is evidence of an improper admission.

104.    Applicable hospice regulations require that patients have hospice eligibility established prior to consent for admission and hospice treatment.

105.    Relator, unlike her co-workers, had training in the CMS regulations

22

regarding hospice and shared her knowledge with her co-workers when she saw them violating basic regulations and LCD's. Relator's supervisors met with Relator to counsel or coach her on the way Altus operated, including the handling of paperwork.

106.    Relator was instructed to stop educating her co-workers about applicable regulations, and told to follow Altus's procedures.

107.    Under Altus's procedures, once a patient is discharged from a hospital, and arrives at the destination where hospice care will be provided, a Altus employee fills in the date, then contacts Dr. Jeffrey Lee, who signs the admission document, signs the Certificate of Terminal Illness, and gives orders to place the patient on Hospice care after consent and admission forms are already complete.

108.    Patients were ineligible for multiple reasons including (a) that they did not agree to forego curative treatment of their illnesses, (b) that they did not have a medical prognosis with a life expectancy of 6 months or less if the illness runs its normal course, (c) they lacked the required physician certifications and signatures, specific clinical information and findings and other documentation supporting a life expectancy of six months or less; (d) they lacked legitimate elections from the patient or person with the patient's power of attorney; (e) the services provided were not consistent with a legitimate and valid plan of care; (f) they did not comply with applicable local coverage determinations ("LCD") for reasonable and necessary services.

109.    Relator has evidence of numerous examples of improper billing for hospice benefits, for the reasons described above.

110.    Key assessment tools used in the hospice industry include the Functional Assessment Scale (or Staging), abbreviated as "FAST"; the Palliative Performance

Scale, abbreviated as "PPS"; the Body Mass Index, abbreviated as "BMI"; the Mid-Arm Circumference, abbreviated as "MAC"; and the New York Heart Association, abbreviated as "NYHA".

111.   Relator advised Altus management of the fraudulent activity she witnessed throughout Altus, but Altus took no action to stop it. She notified Altus management at the regional office up to and including the Assistant director of nursing, Executive Director, and Head of Human Recourses.

112.   At first, Relator believed the fraud was a localized issue with Altus's Houston office. Relator went as far as to inform Altus in writing that continued illegal practices would be reported to the Office of the Inspector General in relation to acts of fraud against CMS. Eventually, Relator learned that the problem was company-wide.

113.   Relator in multiple messages informed management that treatment of a patient was below guidelines set forth by both state and federal regulatory agencies, and that at one point their practice of hospice made her both physically and emotionally ill. In her letter of resignation, Relator informed management that their practice of healthcare is unsafe, a clear danger to their patients and staff. This occurred on or around January 3, 2016 and January 11, 2016.

114.   Jacqueline Richard was the Assistant Nursing director for the Altus Houston North office. Relator repeatedly attempted to educate Ms. Richard on the rules regarding Hospice protocol, but Ms. Richard had no interest in learning the ethical and legal ways of providing hospice care. At one point, Relator emailed Ms. Richard about CMS guidelines on medications for patients. Richard replied, "Thanks for the education, but we are still not paying for the medication." This occurred on or around January 5,

2016.

## X.   CAUSES OF ACTION

### A.   First Cause Of Action

#### Presenting or Causing to be Presented False Claims for Ineligible Patients Under 31 U.S.C. § 3729(a)(1)(A)

115.   Relator re-alleges and incorporates by reference the allegations in this Complaint.

116.   By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims to the United States for payment or approval, as follows:

117.   Defendants submitted false claims for Hospice care provided to patients whom Defendants knew did not meet Medicare or Medicaid requirements for Hospice (because they were not terminally ill; were still receiving curative treatments; were not properly certified; were missing required plans of care, elections of benefits, certifications of terminal illness, and/or other required forms; or otherwise as described herein), in violation of applicable regulations including 42 U.S.C. §1395y (Exclusions from coverage and Medicare as secondary payer).

118.   Defendants submitted false claims for Hospice care provided to patients admitted under a false diagnosis and to whom Defendants did not provide complete palliative services under a legitimate care plan as required by 42 C.F.R. §§ 418.56 (requiring plans of care and interdisciplinary groups); 418.22 (Certification of Terminal Illness); 418.24 (Election of hospice care); and 418.25 (Admission to hospice care based on medical director's consideration of relevant factors).

25

119.    Defendants submitted false claims for Hospice services premised upon Defendants' fraudulent certifications of compliance with Medicare regulations as made on CMS Forms 885A and 1450 and elsewhere.

120.    The United States paid the false claims described herein.

121.    Defendants' fraudulent actions, as described in this Complaint, are part of a widespread, systemic pattern and practice throughout Defendants' network of knowingly submitting or causing to be submitted false claims to the United States through fraudulent certification and re-certification of Hospice patients and fraudulent billing of the United States through Medicare or Medicaid.

122.    Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant by the United States through Medicare and Medicaid for such false or fraudulent claims.

123.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented to the United States false or fraudulent Medicare claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A); that is, defendant Altus knowingly made or presented, or caused to be made or presented, to the United States claims for payment for hospice services for patients across the United States who were not eligible for Medicare hospice benefits during all or part of the time.

124.    By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial; and therefore is entitled to treble damages under the False Claims Act, plus civil penalties as permitted by 31 U.S.C. § 3729, and as adjusted pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, the

Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, 64 Fed. Reg. 47099, 47103 (1999), or otherwise (currently, between $5,500 and $11,000 for conduct on or before November 2, 2015, and between $10,781 and $21,563 for conduct after November 2, 2015.)

## B.  Second Cause Of Action

### Using False Records or Statements Under 31 U.S.C. § 3729(a)(1)(B)

125.  Relator re-alleges and incorporates by reference the allegations in this Complaint.

126.  By virtue of the acts described above, defendant Altus knowingly made or used a false record or statement to get a false or fraudulent Medicare claim paid or approved by the United States, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B); that is, defendant Altus knowingly made or used or caused to be made or used false Medicare claim forms and supporting materials, such as internal billing forms, and false certifications of the truthfulness and accuracy of claims submitted, to get false or fraudulent Medicare claims paid or approved by the United States, that the hospice services claimed were for patients across the United States who were not eligible for Medicare hospice benefits during all or part of the time.

127.  By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial; and therefore is entitled to treble damages under the False Claims Act, plus civil penalties as permitted by 31 U.S.C. § 3729, and as adjusted pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, 64 Fed. Reg. 47099, 47103 (1999), or otherwise (currently, between $5,500 and $11,000 for conduct on or

27

before November 2, 2015, and between $10,781 and $21,563 for conduct after November 2, 2015.)

## XI.   PRAYER FOR RELIEF

WHEREFORE, Relator respectfully prays for judgment in her favor as follows:

a.      Damages in an amount to be established at trial, trebled as required by law,

b.      Civil penalties between $5,500 and $11,000 for conduct on or before November 2, 2015, and between $10,781 and $21,563 for conduct after November 2, 2015, or other civil penalties provided or permissible by law;

c.      Interest, as provided by law;

d.      The maximum amount to Relator allowed pursuant to 31 U.S.C.A. §3730(d), and/or any other applicable provision of law;

e.      Reimbursement for reasonable expenses that Relator incurred in connection with this action;

f.      An award of reasonable attorneys' fees, expenses, and costs; and

g.      Such further relief as this Court deems equitable and just.

## JURY TRIAL DEMAND

Relator hereby demands a jury trial.

Dated:  December 21, 2016.

By:   /s/ Cory S. Fein
Cory S. Fein
Cory Fein Law Firm
712 Main St., Suite 800
Houston, TX  77002
cory@coryfeinlaw.com
(281) 254-7717 (phone)
(530) 748-0601 (fax)

**ATTORNEY FOR RELATOR**